GEICO MARINE INSURANCE
COMPANY,

      **Plaintiff,**

v.                                 **Case No. 8:16-cv-2329-T-27MAP**

JAMES SHACKLEFORD,

      **Defendant.**

_____/

## ORDER

**THIS CASE** was tried before the Court.

### I.    SUMMARY OF THE CASE

On March 13, 2016, GEICO Marine Insurance Company issued a liability only marine insurance policy for James Shackleford's vessel, *Sea the World*. On June 17, 2016, the Vessel suffered damage from inclement weather while moored near Fort Lauderdale. GEICO seeks a declaratory judgment that the policy does not cover the loss because Shackleford breached a navigational warranty in the policy, the implied warranty of seaworthiness, and the maritime duty of *uberrimae fidei* (utmost good faith).

### II.    FACTUAL FINDINGS and CONCLUSIONS

#### A. Purchase of Vessel and Prior Claims

In 2009, Shackleford purchased *Sea the World*, a 1981 65' Irwin sailing vessel, for approximately $120,000. She was insured with Continental Insurance Company. *Sea the World* was subsequently damaged by a lightning strike. And in 2012, she suffered additional damage as a result of negligent repairs at Sailor's Wharf, a yacht yard on the west coast of Florida. In November 2014,

Shackleford settled his claim for damages with CNA and Boat Owners Association of the United States (Boat U.S.), a marine manager that writes, underwrites, and manages claims for insurance companies, including GEICO. (Settlement Agreement, Plaintiff's Ex. 5). In the agreement, the parties agreed that the Vessel was a constructive total loss. In the agreement, CNA and Boat U.S. assigned their rights to pursue claims against Sailor's Wharf to Shackleford. Shackleford sued Sailor's Wharf for damage to the Vessel's hull, the result of improper blocking. The improper blocking resulted in oil canning, or flexing, of her hull. While the lawsuit against Sailor's Wharf was pending, minimal repair work was completed on the Vessel and she remained moored in the water.

## B. Inception of the Policy

In March 2016, Shackleford engaged Taylor Boat Works to haul the Vessel from the water for repairs. Since Taylor Boat Works required liability insurance, Shackleford called GEICO on March 11, 2016 and requested a liability only policy. GEICO issued that policy on March 13, 2016. The next day, GEICO amended coverage to "Port Risk Ashore," which provided "no coverage for navigation, and [that] coverage will only apply to the insured vessel while the boat is out of the water." It is apparent, therefore, and I so find, that at the inception of the policy, GEICO knew of the condition of the Vessel.

GEICO contends that at the inception of the policy, the Vessel was unseaworthy.[1] That contention is disingenuous. When the liability only policy was issued, Shackleford had no intention of sailing the Vessel anywhere, and GEICO knew this. His only intention was to have her hauled from the water for repairs, which GEICO also knew. And tellingly, GEICO's policy did not provide

---

[1] A vessel is seaworthy if it is "reasonably fit for the intended use." *Aguirre v. Citizens Cas. Co. of New York*, 441 F.2d 141, 144 (5th Cir. 1971). And, "[d]etermining the seaworthiness of a vessel at a particular moment in time is the responsibility of the trier of fact." *Id.*

coverage for her hull and equipment. She was, therefore, reasonably fit for hauling from the water, the intended use. *See Aguirre v. Citizens Cas. Co. of New York*, 441 F.2d 141, 144 (5th Cir. 1971). And based on Boat U.S.'s experience with the Vessel, including its participation in Shackleford's prior claim for damages against CNA and the settlement, I find that by inference, GEICO knew that the Vessel required extensive repairs when it issued the policy. Indeed, Shackleford credibly testified that he informed GEICO that she required an extensive refit and repairs.[2]

### C. Navigational Restrictions

The policy provided coverage "[w]hile the boat is afloat within the navigational area shown on the Declarations Page." The Declarations Page did <u>not</u>, however, include a "navigational area." Rather, the March 13 Declarations Page included "Cruising Limits:"

> U.S. Atlantic and Gulf Coastal waters and inland water tributary thereto between Eastport, ME and Brownsville, TX, inclusive and the waters of the Bahamas including the Turks and Caicos, however the boat must be north of Cape Hatteras, NC from June 1 until November 1 annually.

(Plaintiff's Ex. 1, Dkt. 71-39). And, as noted, the Cruising Area on the application stated "Coastal and Inland waters of the U.S. & Canada." (Vessel Application, Defendant's Ex. 2, Dkt. 72-2).

---

[2] While the application does not indicate that the Vessel had been damaged, that is not determinative. First, Shackleford testified that he was not asked if the Vessel was damaged. That is credible, since Boat U.S., GEICO's marine manager, participated in the settlement of Shackleford's prior claim, and prepared the application for the GEICO policy at issue. And as the evidence demonstrated, the application included several erroneous entries. It did not reflect changes Shroeder testified that he made showing that the Vessel was stored in Florida. And the application identified the Vessel as a 1989 Irwin rather than a 1981 Irwin. (Defendant's Ex.2,Dkt. 72-1). Indeed, the Boat Purchase Date, Boat Purchase Price, and Insured Value were incorrect.

These errors on the face of the application were likely the result of careless cutting and pasting from Shackleford's four prior applications with GEICO, including his 2015 application. During argument, GEICO acknowledged that these errors were "less than stellar" underwriting practices. Notably, the Boat Purchase Date and Boat Purchase Price values are identical to Shackleford's 2015 applications for insurance with GEICO for a 2009 Yamaha and 2004 Crownline. (Defendant's Ex. 8, Dkt. 72-4). And, the Cruising Area on all of Shackleford's applications with GEICO was "Coastal and Inland waters of the U.S. & Canada." (Vessel Application, Defendant's Ex. 2, Dkt. 72-1; Yamaha and Crownline Applications, Defendant's Ex. 8, Dkt. 72-4).

### D. March 14, 2016 Endorsement

The day after the policy was issued, a Port Risk Ashore amendment to coverage was added which provided that "[t]his restriction provides no coverage for navigation, and coverage will only apply to the insured vessel while the boat is out of the water." (Policy, Plaintiff's Ex. 1, Dkt. 71-39). That day, GEICO added hull coverage of $264,000 after determining her value. (Policy, Plaintiff's Ex. 1, Dkt. 71-39; Activity Log, Plaintiff's Ex. 7, Dkt. 71-7). GEICO noted that the Vessel was at NE Taylor Boatworks in Bradenton, Florida. (Activity Log, Plaintiff's Ex. 7, Dkt. 71-1). The intended purpose of the Vessel at the time of the endorsement was noted as out of water storage. Consistent with that, the Navigation Area on the March 14 Endorsement was blank, and the Cruising Limits on the March 14 Declarations Page stated Port Risk Ashore.

When the Vessel was hauled out, the oil canning which had been observed at Sailor's Wharf was reduced from 10 - 12 inches to approximately half an inch. After observing the hull correction, Shackleford realized that the presumed structural damage from the oil canning was corrected and the Vessel may not be a constructive total loss. On March 14, an out of water survey of the Vessel was completed. (Plaintiff's Ex. 6, Dkt. 71-6). On May 21, 2016, an additional in-water survey was completed. (Defendant's Ex. 5, Dkt. 72-3).

### E. May 27, 2016 Endorsement

In May 2016, Shackleford requested that GEICO remove the Port Risk Ashore restriction so that he could sail the Vessel to Fort Lauderdale for extensive repairs. He requested "full coverage." GEICO knew, therefore, that the Vessel would be sailed to Fort Lauderdale within a few days for repairs. Shackleford testified that a cruising or navigational limit was "absolutely" not discussed during that conversation, and I find his testimony in that regard credible. Indeed, GEICO's Activity

Log is silent on that.[3] (Activity Log, Plaintiff's Ex. 7, Dkt. 71-7).

To remove the Port Risk Ashore endorsement, GEICO required a survey. Shackleford provided GEICO with the Rich Parrey survey and Steven Berlin's survey addendum. After reviewing those surveys, GEICO recorded the Vessel's condition as "Good," with a fair market value of $345,000, higher than the insured value. (Activity Log, Plaintiff's Ex. 7, Dkt. 71-7). And, on May 27, GEICO removed the Port Risk Ashore endorsement. (Policy, Plaintiff's Ex. 1, Dkt. 71-39; Activity Log, Plaintiff's Ex. 7, Dkt. 71-7). GEICO emailed Shackleford, confirming receipt of the survey and that it "was able to remove the port risk ashore restriction" and "attached a copy of the updated declarations page outlining the removal of this restriction." (Email, Plaintiff's Ex. 2, Dkt. 71-2).[4]

The May 27 Endorsement, like the March 14 Endorsement, had a blank space following "Navigation Area." However, the May 27 Declarations Page, unlike the March 14 Declarations Page, stated:

> CRUISING LIMITS: While afloat, the insured Yacht shall be confined to the waters indicated below:
> (There is no coverage outside of this area without the Company's written permission.)
>
> U.S. Atlantic and Gulf Coastal waters and inland water tributary thereto between Eastport, ME and Brownsville, TX, inclusive and the waters of the Bahamas including the Turks and Caicos, however the boat must be north of Cape Hatteras, NC from June 1 until November 1 annually.

---

[3] GEICO logged eight notes between May 26 and May 27. Those notes do not reference a navigational limit or where the Vessel was being moved, notwithstanding that Shackleford telephoned and emailed GEICO to arrange coverage for the trip to Fort Lauderdale.

[4] Shackleford acknowledged receiving the email but disputed whether the declarations page was attached, explaining that he had difficulty opening attachments to the emails he received from GEICO.

### F. Voyage to Fort Lauderdale

Within a day or two of the May 27 Endorsement, Shackleford sailed the Vessel to Fort Lauderdale. In early June, while she was anchored in Lake Sylvia near Fort Lauderdale, a storm caused her to drag anchor and lodge against a seawall. As a result, she took on water and suffered damage. Shackleford contracted with a boat yard, Cracker Boy, to haul the Vessel out for repairs and filed a claim under the GEICO policy. In August 2016, Michael McCook, a marine loss investigator, inspected the Vessel at Cracker Boy.

### G. Condition of the Vessel before the Trip to Fort Lauderdale

McCook was familiar with the Vessel prior to his inspection in August 2016 because he had inspected her as part of Shackleford's prior claim against CNA and Boat U.S. Indeed, GEICO, through its marine manager, Boat U.S., was aware of the prior claim, the damages the Vessel had suffered, and the terms of the settlement in which the Vessel was declared a constructive total loss.

According to McCook, the reasons for the Vessel taking on water were unrelated to his opinion regarding her seaworthiness. According to him, the Vessel took on water during the storm in Fort Lauderdale because a PVC fitting, rather than a bronze cap fitting, had been used on a plug and debris had fallen on the float switch, preventing the bilge pump from operating properly.[5]

Regarding her seaworthiness, McCook testified that the Vessel was unseaworthy to sail to Fort Lauderdale based on her faulty electrical system and structural damage. His testimony regarding the electrical system was based on a previous survey he reviewed that was not submitted as evidence, "various system failures" Shackleford experienced while sailing, and Shackleford having been shocked by the stove on the Vessel. And, he relied on her state of disarray while she was being

---

[5] Shackleford testified that he put the PVC plug in after the storm to remove water from the Vessel.

repaired at Cracker Boy. McCook's testimony is not persuasive, and does not support GEICO's contentions.

The testimony of Steven Berlin, the marine surveyor Shackleford hired in the Sailor's Wharf litigation, was read into evidence. According to Berlin, the inverter, which converts DC power into AC power, was damaged. Shackleford testified, however, that he was aware of the electrical problems on the Vessel but that AC power was not needed to sail to Fort Lauderdale. And GEICO presented no evidence that AC power was necessary to sail the Vessel or operate her bilge pump.[6] Since AC power was not necessary to sail the vessel to Fort Lauderdale, damages to the inverter did not render the Vessel reasonably unfit for that use. I am, therefore, unpersuaded that any perceived electrical issues rendered the Vessel reasonably unfit to sail to Fort Lauderdale.

McCook's testimony regarding the separated bulk heads and structural integrity of the Vessel is likewise unpersuasive. On March 14, Berlin conducted an out of water survey and inspected her hull. At that time, the hull "did not show any evidence of any structural weaknesses. The bottom was sounded and found in good condition with no evidence of delamination detected . . . . There was some minor 'Oil Canning' . . . , but the noted 'Oil Canning' [was] not affecting the structural integrity[.]" (Defendant's Ex. 4, Dkt. 72-2). And on May 24, just prior to the trip to Fort Lauderdale, Rich Parrey conducted an in-water survey of the Vessel. Using "hammer testing," Parrey found that the hull was "structurally good," and the "[t]hrough hulls that could be seen with the boat in water were inspected, good condition, and secure to the hull." (Defendant's Ex. 5, Dkt. 72-3). As noted, McCook testified that the partial flooding of the Vessel was related to the debris falling on the switch

---

[6] Indeed, the May 24 survey found that the "automatic bilge pump [was] installed and observed working." (Defendant's Ex. 5, Dkt. 72-3).

and fitting, not from structural damage.

In sum, McCook's opinion that the Vessel was unseaworthy to sail to Fort Lauderdale is undermined by other credible evidence, and is therefore rejected. It is undisputed that the Vessel successfully sailed from Bradenton to Fort Lauderdale, without AC power. And, two marine surveyors, who inspected the Vessel before the trip, found no evidence of structural weaknesses. Accordingly, I find that the Vessel was reasonably fit for the trip from Bradenton to Fort Lauderdale.

## III. FINDINGS and CONCLUSIONS OF LAW

### Count I - Breach of the Navigational Warranty

GEICO contends that Shackleford breached the navigational warranty because the Vessel was south of Cape Hatteras in June 2016 when the loss occurred. To determine whether the navigational warranty was breached, it must be determined whether the policy included a navigational warranty. I find that it did not.

"[I]n the absence of a specific and controlling rule, the interpretation or construction of a marine insurance contract is to be determined by state law." *All Underwriters v. Weisberg*, 222 F.3d 1309, 1313 (11th Cir. 2000); *see Gulf Tampa Drydock Co. v. Great Atl. Ins. Co.*, 757 F.2d 1172, 1174 (11th Cir. 1985) ("[A]dmiralty courts will generally look to appropriate state law in determining questions involving a marine insurance contract."). As there is no controlling rule of federal law governing interpretation of inconsistencies between an insurance policy and an endorsement, the interpretation of the policy is determined by Florida law. *See LaMadrid v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 567 F. App'x 695, 699 (11th Cir. 2014); *Fenby v. M/V Three D of Guernsey*, 217 F. App'x 846, 848 (11th Cir. 2007).

Under Florida law, an insurance policy should be construed in its entirety and given a

construction reflecting the intent of the parties. *Gulf Tampa Drydock*, 757 F.2d at 1174. "'[I]f the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and the [sic] another limiting coverage, the insurance policy is considered ambiguous.'" *Ruderman ex rel. Schwartz v. Washington Nat. Ins. Corp.*, 671 F.3d 1208, 1211 (11th Cir. 2012), *certified question answered sub nom. Washington Nat. Ins. Corp. v. Ruderman*, 117 So. 3d 943 (Fla. 2013) (quoting *Auto–Owners Ins. Co. v. Anderson*, 756 So.2d 29, 34 (Fla. 2000)). And when policy language is unclear, "the language must be construed against the insurer." *Gulf Tampa Drydock*, 757 F.2d at 1174. Finally, and significant here, "to the extent an endorsement is inconsistent with the body of the policy, the endorsement controls." *Steuart Petroleum Co. v. Certain Underwriters at Lloyd's London*, 696 So. 2d 376, 379 (Fla. 1st DCA 1997).

As noted in the Order denying summary judgment, GEICO's contention that Shackleford breached the navigational warranty because the Vessel was south of Cape Hatteras when the loss occurred seems straightforward, because the Vessel was outside the cruising limits prescribed in the Declarations Page when the loss occurred. And that remains GEICO's position. A careful analysis of the policy and its endorsements, however, reveals an inconsistency between the endorsement and Declarations Page issued on May 27, 2016 with respect to whether there was a navigational restriction in effect when the loss occurred.

To put the issue of whether Shackleford breached a navigational warranty in the proper context, a brief, albeit repetitive, review of the history of the policy is helpful. GEICO issued the policy on a liability only basis on March 13, 2016. The "General Conditions" section of the policy provided:

Where Covered:
Coverage is provided:
A. While the boat is afloat within the navigational area shown on the Declarations Page; and
B. While the boat or its equipment is ashore or being transported by land conveyance in the United States or Canada.

(Policy, Plaintiff's Ex. 1 at 22, Dkt. 71-39). However, as noted, the Declarations Page did not have a "Navigational Area," but included a section titled "Cruising Limits" that specified that "the boat must be north of Cape Hatteras, NC from June 1 until November 1 annually." (*Id.* at 2).

Consistent with Shackleford's intention to haul the Vessel from the water, on March 14, 2016, GEICO issued an endorsement that amended coverage to "Port Risk Ashore," which provided "no coverage for navigation, and [that] coverage will only apply to the insured vessel while the boat is out of the water." (*Id.* at 8). The "Navigation Area" section in the endorsement was accordingly left blank, since the Vessel would be out of the water. And the Cruising Limits section of the Declarations Page issued with the endorsement provided that coverage is "Port Risk Ashore." (*Id.* at 7).

Intending to take the Vessel to Fort Lauderdale for repairs, Shackleford telephoned and emailed GEICO, requesting removal of the Port Risk Ashore restriction and "full coverage,"[7] so that

---

[7] The parties presented conflicting testimony regarding the inception of the policy and whether navigational limits, if any, were discussed. Patrick Shroeder, a sales supervisor for Boat U.S., testified that on March 12, he spoke with Shackleford regarding navigational limits for the policy and was told that the Vessel would be moved from Florida to outside Chicago. On cross-examination, however, Shroeder admitted that he was unsure who told him the Vessel would be kept outside Chicago and that the storage information (showing that the Vessel would be stored at a marina in Gary, Indiana) was on the application when it came to him. And he admitted that he did not ask Shackleford whether he intended to keep the Vessel north of Cape Hatteras, North Carolina during hurricane season. He recalled, however, that Shackleford did not want Great Lakes navigational limits because the Vessel was in Florida. On redirect, Shroeder testified that he explained that the navigational limits required the Vessel to be stored north of Cape Hatteras between June and November and that Shackleford agreed to that limit. But Shackleford maintained that no such conversation occurred.

Shroeder's conflicting testimony is less than credible, but not because he intended to mislead the Court or testify less than candidly. Rather, his recollection of his conversation with Shackleford was not sufficiently reliable and in part inconsistent with his notes of those conversations. Indeed, he noted that he "spoke with the insured, **changed storage**

he could sail her to Fort Lauderdale that week for repairs. Although Shackleford's May 26, 2016 email requesting removal of the Port Risk Ashore restriction was not introduced, GEICO acknowledges that he sent the email. (Dkt. 66 at p. 14). And, as required by GEICO, he provided the Rich Parrey survey and an addendum to Steven Berlin's survey, in support of his request. He began the voyage to Fort Lauderdale at the end of May 2016 and successfully completed it. And the loss occurred in Fort Lauderdale in June 2016.

GEICO argues that the navigational limit in the March 13 Declarations Page controls, and Shackleford, therefore, breached the navigational warranty because the Vessel was south of Cape Hatteras when the loss occurred. Shackleford counters that the May 27 Endorsement that removed the Port Risk Ashore restriction without providing a navigational limitation controls over the inconsistent Declarations Page, and that any ambiguities between the two must be construed against GEICO as the drafter.

As noted, the May 27 Endorsement removed the Port Risk Ashore restriction, but left the "Navigation Area" section blank. The policy provided coverage "[w]hile the boat is afloat within the *navigational area* shown on the Declarations Page[.]" (emphasis added). But there was not a "Navigational Area" in the Declarations Page. Rather, a "Cruising Limits" section was included which provided that "[t]here is no coverage outside of this area [, north of Cape Hatteras, NC during hurricane season,] without the Company's written permission."[8] Accordingly, there is an

---

and nav limits of the boat to show that it is currently in FL. [H]e is moving up north to outside [C]hicago soon but needs to be rated as FL currently since have defined nav limits in [standard yacht policy]." (Activity Log, Plaintiff's Ex. 7, Dkt. 71-7) (emphasis added). And again, Shackleford testified that he did not request navigational limits.

[8] Although drawing a distinction between "navigation area" and "cruising limits" may appear to be semantics, that is not the test. Rather, as will be discussed, the rules governing interpretation and construction of insurance policies are determinative.

inconsistency between the May 27 Endorsement and the Declarations Page. In that circumstance, and determinative here, the endorsement controls. *Steuart Petroleum*, 696 So. 2d at 379. There was, therefore no "Navigational Area" specified in the endorsement.[9]

Moreover, any ambiguity arising from the inconsistency between the May 27 Endorsement and Declarations Page with respect to navigational limits "is to be liberally construed in favor of coverage and strictly against the insurer." *Washington Nat. Ins. Corp. v. Ruderman*, 117 So. 3d 943, 951 (Fla. 2013) (answering certified question from the Eleventh Circuit); *see LaMadrid*, 567 F. App'x at 699; *Aetna Ins. Co. v. Webb*, 251 So. 2d 321, 323 (Fla. 1st DCA 1971); *New Amsterdam Cas. Co. v. Addison*, 169 So. 2d 877, 881 (Fla. 2d DCA1964) ("[A]mbiguous, equivocal, or uncertain" terms "are to be construed strictly and most strongly against the insurer and liberally in favor of the insured so as to effect the dominant purpose of payment to the insured.").

I conclude, therefore, liberally construing the policy in favor of coverage, that as of May 27,

---

[9] The Declarations Page and endorsements must be read consistently with the General Conditions section of the policy, which states that "[c]overage is provided . . . [w]hile the boat is afloat within the *navigational area* shown on the Declarations Page." (Plaintiff's Ex. 1 at 22, Dkt. 71 - 39) (emphasis added); *see also Auto-Owners Ins. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000)(A policy must be read "as a whole, endeavoring to give every provision its full meaning and operative effect.").

Notwithstanding, as noted, the May 27 Declarations Page does not use the term "navigational area." Rather, the term "Cruising Limits" is used. More importantly, both the March 14 and May 27 endorsements reference "Navigation Area," but that section was left blank in both. Likewise, in the May 27 Endorsement, the Port Risk Ashore restriction was removed and the "navigation area" section was left blank. A reasonable interpretation of the May 27 Endorsement, therefore, and associated Declarations Page, is that the "navigation area" coverage limitation was removed. The policy, therefore, can reasonably be interpreted as including no navigational limit when the vessel suffered the loss in June 2016. *See Time Ins. Co. v. Neumann*, 634 So. 2d 726, 729 (Fla. 4th DCA 1994) (Holding that a blank section in a health insurance contract created an ambiguity as to whether the insured was required to undergo a medical exam before the policy would become effective: "One interpretation of the application and conditional receipt is that no medical exam is required where the exam is not requested at the time the application is completed. This is certainly a reasonable interpretation where the application leaves blank the very space which is contained therein to notify the insured that the examination is to be completed by a person or entity on a given date and time.").

The reasonableness of this interpretation is further demonstrated by the evidence that Shackleford notified GEICO of his intent to sail the Vessel to Fort Lauderdale when he requested removal of the Port Risk Ashore restriction. GEICO issued the endorsement with that knowledge, but left the navigation area section of the endorsement blank.

the policy did not include a navigational warranty.[10] It follows, therefore, that Shackleford did not breach a navigational warranty.

## Count II - Breach of Absolute Implied Warranty of Seaworthiness

In Count II, GEICO contends that the policy is void because Shackleford breached the absolute implied warranty of seaworthiness at the inception of the policy. Shackleford counters that the parties contracted out of the implied warranty.

### A. Whether the vessel was unseaworthy at the inception of the policy

In admiralty, a vessel owner impliedly warrants the seaworthiness of a vessel at the inception of an insurance policy. *State Nat'l Ins. Co. v. Anzhela Explorer, L.L.C.*, 812 F. Supp. 2d 1326, 1365 (S.D. Fla. 2011) (citing *Kilpatrick Marine Piling v. Fireman's Fund Ins. Co.*, 795 F.2d 940, 945 (11th Cir. 1986)); *Employers Ins. of Wausau v. Occidental Petroleum Corp.*, 978 F.2d 1422, 1432 (5th Cir. 1992) ("The insured breaches this first warranty [, the absolute implied warranty of seaworthiness,] if the vessel is in fact unseaworthy when the policy becomes effective."); *L & L Marine Serv., Inc. v. Ins. Co. of N. Am.*, 796 F.2d 1032, 1035 (8th Cir. 1986) ("The first is an absolute warranty by the assured that a vessel is seaworthy at the time that the insurance policy attaches."); *Gulfstream Cargo, Ltd. v. Reliance Ins. Co.*, 409 F.2d 974, 983 (5th Cir. 1969).

If the implied warranty of seaworthiness applies and a vessel is unseaworthy at the inception of the policy, there is a breach of the implied warranty of seaworthiness and the policy is void. *Gulfstream Cargo, Ltd.*, 409 F.2d at 983. A vessel is seaworthy if it is "reasonably fit for the

---

[10] Even if there was, GEICO implicitly waived the restriction when it agreed that the Vessel could be sailed to Fort Lauderdale for repairs in late May 2016. *See Mid-Continent Cas. Co. v. Basdeo*, 742 F. Supp. 2d 1293, 1330 (S.D. Fla. 2010), *aff'd*, 477 F. App'x. 702 (11th Cir. 2012) ("Under Florida law, '[w]aiver' is 'the intentional relinquishment or abandonment of a known right or privilege, or conduct that warrants an inference of the relinquishment of a known right.'" (quoting *Hale v. Dep't of Revenue*, 973 So.2d 518, 522 (Fla. 1st DCA 2007) (alteration in original))).

intended use." *Aguirre*, 441 F.2d at 144. And, "[d]etermining the seaworthiness of a vessel at a particular moment in time is the responsibility of the trier of fact." *Id.*

As noted, when the policy was issued, the intended use of the Vessel was for her to be hauled out of the water for repairs. She was therefore "seaworthy" for that intended use, as she was reasonably fit to be hauled out. Indeed, at its inception, the policy did not provide for hull coverage and was issued by GEICO on a liability only basis, and GEICO noted the intended use as out of water storage.[11] Assuming, therefore, that an absolute implied warranty of seaworthiness was implied in the policy, Shackleford could not have breached it, since the Vessel was fit to be hauled out of the water for repairs at the inception of the policy.[12]

## B. Whether the parties contracted out of the implied warranty of seaworthiness

GEICO contends that the Vessel was not seaworthy for the trip to Fort Lauderdale. As discussed, that contention is not supported by the evidence. In any event, I find alternatively that the parties contracted out of the implied warranty of seaworthiness.

---

[11] The parties apparently presume that the warranty of seaworthiness is implied in a liability only policy, even when the vessel is not in navigation at the inception of the policy. *See L & L Marine*, 796 F.2d at 1035 ("American maritime law implies into every time hull insurance policy a warranty of seaworthiness."(citing *see, e.g., Insurance Co. of North America v. Board of Commissioners*, 733 F.2d 1161, 1165 (5th Cir.1984); *McAllister Lighterage Line v. Insurance Co. of North America*, 244 F.2d 867, 870–71 (2d Cir.1957); *Saskatchewan Government Insurance Office v. Spot Pack, Inc.*, 242 F.2d 385, 388 (5th Cir.1957); *Henjes v. Aetna Insurance Co.*, 132 F.2d 715, 719 (2d Cir.1943); *Texaco, Inc. v. Universal Marine, Inc.*, 400 F.Supp. 311, 323 (E.D.La.1975); *Nuebros Corp. v. Northwestern National Insurance Co.*, 359 F.Supp. 310, 315–16 (E.D.N.Y.1972))); *but see Underwriters at Lloyds v. Labarca*, 260 F.3d 3, 9 (1st Cir. 2001) ("It is true that while the duty of seaworthiness is implied in every marine insurance policy . . ., it is not an indefinite warranty and does not apply at all times." (citing *see, e.g., West v. United States*, 361 U.S. 118, 122, 80 S.Ct. 189, 4 L.Ed.2d 161 (1959) (determining that "it would be an unfair contradiction to say that the owner held the vessel out as seaworthy" where vessel was turned over to ship repair contractor for complete overhaul for sole purpose of making her seaworthy); *Roper v. United States*, 368 U.S. 20, 21–22, 82 S.Ct. 5, 7 L.Ed.2d 1 (1961) (where vessel is not "in navigation"—*i.e.,* no longer used to travel the seas—it carries no warranty of seaworthiness))).

[12] Federal maritime law implies a second warranty of continuing seaworthiness, a modified negative warranty, which is not raised in this case. *Employers Ins. of Wausau v. Occidental Petroleum Corp.*, 978 F.2d 1422, 1432 (5th Cir. 1992); *Gulfstream Cargo, Ltd.* 409 F.2d at 983 n. 26; *Anzhela Explorer*, 812 F. Supp. 2d at 1377. Under this modified negative warranty, which applies only after the policy attaches, "the insured promises not to knowingly send a vessel to sea in an unseaworthy condition." *Employers Ins. of Wausau*, 978 F.2d at 1432.

Unlike the effect of a breach of the absolute implied warranty of seaworthiness in admiralty, under Florida law, a breach of a warranty in a marine insurance policy does not void the policy, unless the breach increased the hazard insured against. *Fireman's Fund Ins. Co. v. Cox*, 742 F. Supp. 609, 611 (M.D. Fla.), *aff'd*, 892 F.2d 87 (11th Cir. 1989); *see* Fla. Stat. § 627.409. In Florida, the insurer must demonstrate a causal connection between the breach of warranty and the loss to avoid coverage. *See Commercial Union Ins. Co. v. Flagship Marine Servs., Inc.*, 190 F.3d 26, 32 (2d Cir. 1999) (observing that Florida does not require strict compliance with all warranties, and requires, "unlike the majority of states," "that the insurer demonstrate a causal connection between a breach of warranty and the loss in order to avoid coverage" (citation omitted)). The law "'is designed to prevent the insurer from avoiding coverage on a technical omission playing no part in the loss.'" *Windward Traders, Ltd. v. Fred S. James & Co. of New York*, 855 F.2d 814, 818 (11th Cir. 1988) (quoting *Pickett v. Woods*, 404 So.2d 1152, 1153 (Fla. 5th DCA 1981)). If, therefore, the parties contracted out of the absolute implied warranty of seaworthiness and Florida law applies, GEICO must show that the Vessel's unseaworthiness increased the risk that she would take on water and suffer damage during a storm.

"[P]arties are free to 'contract-out' or 'contract around' state or federal law with regard to a[] [marine] insurance contract, so long as there is nothing void as to public policy or statutory law about such a contract." *King v. Allstate Ins. Co.*, 906 F.2d 1537, 1540 (11th Cir. 1990). Although the implied warranty of seaworthiness may be "entrenched" in federal maritime jurisprudence, a policy may alter the traditional implied warranty. *Id.* at 1541 (there is "no public policy problem whatsoever in parties to a maritime insurance contract setting the terms of the policy between them, we uphold their freedom to do so"); *Aguirre,* 441 F.2d at 146; *Anzhela Explorer,* 812 F. Supp. 2d

15

at 1377.

In the policy, GEICO and Shackleford agreed that Florida law applies in the event of a conflict between Florida law and the terms of the policy. Specifically, they agreed that "[a]ny terms of this policy that conflict with the laws of the state where this policy is issued are considered amended to conform to such laws." (Policy, Plaintiff's Ex. 1, Dkt. 71-39). Accordingly, Florida law, rather than admiralty law, applies with respect to GEICO's claim of breach of the absolute implied warranty of seaworthiness, since Florida law regarding warranties conflicts with the absolute implied warranty of seaworthiness in admiralty law. *Compare Gulfstream Cargo, Ltd.*, 409 F.2d at 983, *with Fireman's Fund Ins. Co.*, 742 F. Supp. at 611, *and* Fla. Stat. § 627.409.

Accordingly, on the issue of seaworthiness, GEICO and Shackleford contracted out of the absolute implied warranty of seaworthiness. GEICO must therefore show that Shackleford's conduct constituted a breach of the implied warranty of seaworthiness and that breach increased the risk. GEICO has not done so. As the evidence demonstrates, and I so find, the damage to the Vessel was a result of debris falling on the switch and the PVC fitting, not from structural damage, electrical deficiencies, or any other proffered suggestion of unseaworthiness. She was seaworthy for the intended use contemplated by the policy.

**Count III - *Uberrimae Fidei***

In Count III, GEICO contends that Shackleford breached the doctrine of *uberrimae fidei* (utmost good faith) by failing to disclose its condition and value. *Uberrimae fidei* requires an insured to voluntarily and fully disclose all facts within his knowledge that are material to a calculation of the insurance risk. *HIH Marine Servs., Inc. v. Fraser*, 211 F.3d 1359, 1362 (11th Cir. 2000) (citing

*Cigna Prop. & Cas. Ins., Co. v. Polaris Pictures Corp.*, 159 F.3d 412, 420 (9th Cir. 1998)).[13] But parties to a marine insurance policy may contract out of *uberrimae fidei* so long as the contract is not void as to public policy or statute. *King*, 906 F.2d at 1542. And, when parties "contract for their own standard to show misrepresentation or omission," that language "controls the rights and obligations of the parties," and the doctrine of *uberrimae fidei* does not apply. *Id.* at 1542-43.

As I determined in denying GEICO's motion for summary judgment, I again find that GEICO and Shackleford contracted out of the doctrine of *uberrimae fidei* when they agreed to the following language in the Fraud and Concealment section of the policy:

> There is no coverage from the beginning of this policy if you or your agent has omitted, concealed, misrepresented, sworn falsely, or attempted fraud in reference to any matter relating to this insurance before or after any loss.

This language imposes broader obligations on the insured than the doctrine of *uberrimae fidei*. When read in conjunction with the application, this language essentially requires an intent to defraud on the part of the applicant/insured, a much more stringent standard than that imposed by the doctrine of *uberrimae fidei*. Accordingly, the policy language controls Shackleford's obligations. *King*, 906 F.2d at 1542.

As an alternative argument, GEICO contends that Shackleford breached both the doctrine of *uberrimae fidei* and the terms of the policy. Notwithstanding, under either theory, GEICO's contention is not supported by the evidence. Even if the doctrine of *uberrimae fidei* applies, GEICO

---

[13] "The principle of *uberrimae fidei* does not require the voiding of the contract unless the undisclosed facts were material and relied upon." *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 871 (2d Cir. 1985); *see also I.T.N. Consolidators, Inc. v. Northern Marine Underwriters, Ltd.*, 464 F. App'x 788, 794 (11th Cir. 2012) (per curiam). A fact is material if "'it might have a bearing on the risk to be assumed by the insurer.'" *HIH Marine Services, Inc., v. Fraser*, 211 F.3d 1359, 1363 (11th Cir. 2000) (quoting *Northfield Ins. Co. v. Barlow*, 983 F. Supp. 1376, 1380 (N.D. Fla. 1997)). Questions of materiality involve assessments within the province of the trier of fact. *AIG Centennial Ins. Co. v. O'Neill*, 782 F.3d 1296, 1303 (11th Cir. 2015).

has not carried its burden of demonstrating that Shackleford breached his obligations thereunder by not disclosing facts material to GEICO's calculation of the risks.

With respect to the condition of the Vessel, at the inception of the policy, GEICO, through Boat U.S., knew that the Vessel had been declared a constructive total loss after Shackleford's claim against CNA was resolved, because the Settlement Agreement expressly declared that to be the case. (Settlement Agreement, Plaintiff's Ex. 5, Dkt. 71-5). During final argument, GEICO acknowledged a "fair inference" that Boat U.S. had available information that the Vessel had been declared a constructive total loss. And GEICO knew that Shackleford needed insurance because she was about to be hauled from the water incident to his claim against Sailor's Wharf for structural damage from the improper blocking. (Activity Log, Plaintiff's Ex. 7, Dkt. 71-7) ("[M]r stated he as adv they bound at liab only to move boat then could add hull coverage with PRA restriction until survey[.] Reviewed with Keith and he adv ok[.] Added PRA with hull cov at 264,000 effective immediately."). This explains why GEICO insured the Vessel on a liability only basis. And since GEICO would not insure the hull of the Vessel without a survey, by inference, GEICO was aware that her condition was in question.

I find that Shackleford did not fail to disclose the condition of the Vessel to GEICO, either at the inception of the policy or as the endorsements were added. He was not asked about her condition when he called in the application, and for good reason, since Boat U.S. and GEICO knew that she had been declared a constructive total loss in the CNA litigation. Nor did the evidence demonstrate that he concealed or misrepresented her condition at any time while the policy was in place.

Initially, he understandably (and correctly, as it turned out) assumed, since Boat U.S. had

18

been involved in his claim against CNA, that GEICO was aware of her history. And while GEICO maintains that Shackleford failed to disclose that nothing had been done to repair the problems that led to her being considered a constructive total loss when he applied for the policy, GEICO fails to acknowledge that it issued the policy on a liability only basis because she was being hauled from the water for inspection of the damages to her hull.

Shackleford testified credibly that as far as he was concerned, the boat had salvage value only because of the structural damage caused by Sailor's Wharf, and he had no intention to sail her anywhere. Indeed, he procured the GEICO policy only because the boatyard required it before it would haul her out of the water. And that explains why GEICO added the Port Risk Ashore endorsement, since it knew that she would not be navigating. Only after she was inspected and he discovered that the hull damage was not as bad as he thought did Shackleford decided to sail her to Fort Lauderdale for repairs. And GEICO agreed to remove the Port Risk Ashore restriction for that very purpose.

Moreover, Shackleford informed GEICO that the Vessel needed extensive repairs when he requested removal of the Port Risk Ashore endorsement so that she could be moved to Fort Lauderdale for repairs.[14] And before GEICO would place hull coverage on the Vessel for the voyage to Fort Lauderdale, it required Shackleford to provide a marine survey. Shackleford provided the surveys, which detailed the condition of the Vessel. After reviewing the surveys, GEICO removed the Port Risk Ashore restriction, recorded the Vessel's condition as "Good," and recommended certain repairs. (Activity Log, Plaintiff's Ex. 7, Dkt. 71-7; Recommendation List and Response,

---

[14] As noted, GEICO knew that the Vessel was at NE Taylor Boatworks. (Activity Log, Plaintiff's Ex. 7, Dkt. 71-7).

Plaintiff's Ex. 2, Dkt. 71-2). GEICO was therefore aware of the Vessel's condition when it removed the Port Risk Ashore endorsement and issued the May 27 Endorsement and updated Declarations Page.

In sum, GEICO knew the Vessel's history and condition, and issued the liability only policy consistent with its calculation of the insurance risk. Anything Shackleford did or did not do when the application was submitted could not, therefore, have been material to GEICO's decision, as it had no bearing on the risk it assumed in insuring the Vessel. *HIH Marine Servs.*, 211 F.3d at 1363; *see I.T.N. Consolidators, Inc. v. Northern Marine Underwriters, Ltd.*, 464 F. App'x 788, 794 (11th Cir. 2012) (per curiam) ("Because all parties knew of the loss here, a misrepresentation that no known loss had occurred could not have led Northern to rely on that statement, and would in no way constitute a material misrepresentation in breach of *uberrimae fidei*.").

Finally, with respect to GEICO's contention that Shackleford failed to disclose the value of the Vessel at the inception of the policy, as noted, GEICO knew she had been declared a total constructive loss. Moreover, her value at the inception of the policy was not material to GEICO's calculated risk because her hull was not insured. And when hull coverage was added, GEICO waived its own requirement and insured the hull without a survey, at a value it determined. And with respect to GEICO's contention that Shackleford failed to disclose that his surveyor valued the Vessel at $100,000, the record demonstrates that GEICO determined the value of the Vessel on its own.[15] It follows that any non-disclosure by Shackleford had no bearing on the risk GEICO assumed when

---

[15] Shroeder's testimony that GEICO would not have issued a policy for a vessel that was not sound and seaworthy is belied by the evidence. GEICO, after reviewing the surveys provided by Shackleford, agreed to insure the Vessel before its voyage to Fort Lauderdale. And, his testimony that GEICO would not have insured the hull for $264,000 if Shackleford had said it was worth $50,000 or $100,000 is irrelevant. Her purchase price in the application was $25,000. GEICO was aware of the Settlement Agreement in which she was declared a total constructive loss before it issued the subject policy and ultimately insured her for $264,000, determining her value on its own.

it insured her hull.[16] I find and conclude, therefore, that the evidence does not demonstrate that Shackleford breached either the doctrine of *uberrimae fidei* or the Fraud and Concealment section of the policy. *Cf Gulfstream Cargo, Ltd.*, 409 F.2d at 983 (policy voided where vessel was "even unfit for dry docking" and the survey report was concealed).

## IV. CONCLUSION

I find in favor of Defendant JAMES SHACKLEFORD and against Plaintiff GEICO MARINE INSURANCE COMPANY on each Count of GEICO's Complaint and declare that the policy provides coverage for the damage to *Sea the World* suffered in Fort Lauderdale. The Clerk is directed to enter judgment in favor of JAMES SHACKLEFORD and against GEICO MARINE INSURANCE COMPANY and close this case. Jurisdiction to tax costs and award attorneys fees is reserved, on timely application.

**DONE AND ORDERED** this *19th* day of April, 2018.

JAMES D. WHITTEMORE
**United States District Judge**

Copies to: Counsel of record

---

[16] Indeed, the perceived value of the Vessel varied. It was purchased for $120,000 in May 2009. (Plaintiff's Ex. 4, Dkt. 71-4). In March 2016 and before Shackleford knew the oil canning to the Vessel had corrected, he assigned her a salvage value of $50,000. On March 14, 2016, the first surveyor valued her at approximately $100,000. (Plaintiff's Ex. 6, Dkt. 71-6). And, even though no repairs had been made, GEICO provided $264,000 in hull coverage in the March 14 Endorsement and two months later, valued her at $345,000, with a $2,800,000 replacement value. And in the application, Boat U.S. erroneously listed the purchase price as $25,000. As discussed, *supra* note 2, the application included several errors and discrepancies.